IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DANIEL OWENS,

                Plaintiff,                              ORDER

  v.

                                                      09-cv-511-slc

DONNA JOHNSON, JEFF HALL and
ARNOLD POTEK,

                Defendants.

---

Plaintiff Daniel Owens is a paraplegic who claims that he received constitutionally inadequate medical treatment of his pressure sores while incarcerated at the Polk County Jail. This court has granted Owens leave to proceed on a substantive Eighth Amendment claim against defendant Donna Johnson, the jail's nurse, and on a constitutional conspiracy claim against Johnson and two physicians with whom she consulted, defendants Jeff Hall and Arnold Potek.

Johnson has moved for summary judgment on both of Owens's claims against her. Dkt. 35. I am granting this motion because the evidence establishes that Johnson was *not* deliberately indifferent to Owens's serious medical needs. Because there is no substantive Eighth Amendment violation, Owens's conspiracy claim evaporates. As a result, all three defendants are entitled to summary judgment.

From the parties' proposed findings of fact I find these facts to be to be material and undisputed:

## FACTS

**I. Parties**

At all times relevant to this action, Plaintiff Daniel E. Owens was an inmate at the Polk County Jail. Defendant Donna L. Johnson is a public health nurse and a certified correctional

health professional. She was and is the Polk County jail nurse. Defendants Jeff Hall and Arnold Potek are physicians with whom Johnson consulted about Owens's medical condition and treatment needs.

## II. Owens's Pressure Sores

Since 2002, Owens has been a paraplegic at the T12-L1 level. He retains full use of his arms and hands. Because of his paraplegia, Owens has suffered from pressure sores at times. When he had such sores, Owens would care for them by using wet-to-dry dressings, which he changed himself. Sometime in early 2007, Owens began suffering from several pressure sores. He had one on his right ankle, two on his big toe and two on each side of his buttock.

On April 2, 2007, while still free in the community, Owens went to the Osceola Medical Center to have the pressure sores on his buttock examined. Owens was examined by Dr. Kevin Nepsund, who noted that of the two large ulcers Owens had on his buttock, the one on the right was larger. Dr. Nepsund attempted to "debride the most necrotic tissue on the ulcer . . .."[1] Owens Aff., dkt. 65, ex. 1. Dr. Nepsund further noted that Owens "will need surgical debridement further, especially the wound on the right. We will plan on taking him to the OR in the near future to help debride it some, but he will need referral to surgery most probably for further debridement and probable flap placement." *Id.* Owens was instructed to change damp to dry dressings on the ulcers twice a day and to improve his hygiene. Dr. Nepsund noted the possibility of having Owens receive the county's home healthcare, but recognized that Owens had a poor history of complying with the service.

---

[1] That is, to cut out the dead tissue.

On April 4, 2007, Owens was incarcerated at the Polk County jail. During intake, Owens explained to the booking officer that he had pressure sores, his sores had been examined at the Osceola Medical Center two days earlier, there was a follow-up appointment scheduled for April 6, 2007 and Owens had an appointment to see a surgeon the following week. Owens also reported that he had been receiving nursing visits every other day at his home through Polk County's home healthcare.

As a result of this report, Johnson met with Owens the next morning to assess him and to discuss his medical needs. Johnson discussed treatment options with Owens and they agreed that the jail would provide Owens with the same wound care he had been receiving outside the jail, which included providing Owens with dressing supplies such as gauze, saline water and tape. Owens was given supplies to keep in his cell so that he could care for his pressure wounds himself, and he was permitted to request additional supplies as needed. Owens told Johnson that he had been scheduled to meet with a surgeon in a couple days to have his wound debrided and to receive other treatment.

After talking with Owens, Johnson called the Polk County Home Heath Care supervisor, Leslie Larsen, to tell her that Owens would not be at home for any scheduled treatments, and to learn about the treatment Owens had been receiving. Johnson was told that Owens had been discharged from receiving home healthcare for failing to be home when the nurses were scheduled to come care for him. Johnson also called the Osceola Medical Center and spoke with defendant Dr. Arnold Potek, who had previously treated Owens's pressures sores. Johnson and Potek discussed Owens's current condition, his recent medical history and the treatment he would receive at the jail. Potek told Johnson that Owens had not been scheduled for any surgery

3

and that he believed that Owens was a poor candidate for surgery because he had a history of not caring for his pressure wounds.

On April 9, 2007, defendant Johnson placed Owens on a hygiene program to help protect his existing open pressure sores and to prevent infections. This program included having Owens shower daily to clean open sores and providing him with clean linens and a clean uniform twice a day to keep any cloth touching the sores clean. That same day, Johnson contacted defendant Dr. Jeffery Hall, one of the jail's contract physicians, to discuss Owens's pressure ulcers and how to care for them. Dr. Hall said he wanted to examine Owens, so an appointment was scheduled for Owens to see Hall the next day.

After examining Owens the following day, Dr. Hall prescribed Owens 500 mg of the antibiotic Ciprofloxacin twice a day for ten days. Hall also recommended that Owens use wet-to-dry dressings on the wounds and follow up with his surgeon and/or other physicians.

Johnson was on vacation from work from April 10, 2007 until April 26, 2007. During that time nurse Gail Peterson served as the jail nurse. The day after Dr. Hall's examination of Owens, nurse Peterson called Dr. Potek to advise him of the treatment planned for Owens. Dr. Potek agreed that use of ciprofloxacin and wet-to-dry dressings were appropriate; if this didn't ameliorate Owens's wounds, then they could explore other care options. Dr. Potek confirmed that no surgery was scheduled for Owens at that time.

Nurse Peterson saw Owens again on April 17, 2007. She informed Owens that based on her conversation with Dr. Potek, Owens was not in need of surgery at that time. After the assessment, Owens was scheduled to have a follow-up meeting with a doctor after he completed his antibiotic prescription. Owens had his follow-up appointment with Dr. Hall on April 24, 2007. At the exam, Dr. Hall noted that there was a significant decrease in drainage and odor

in Owens's wounds, though the right ulcer remained deep.  Owens was reassessed on May 7, 2007, this time by nurse Peterson.  She found that the skin around Owens's wounds was becoming irritated from the tape used to hold the dressings in place, so she provided him with cream to protect the surrounding skin from further irritation.

During his 1 ½ months in jail, Owens continued to tell Johnson and Dr. Hall that he was supposed to have surgery for his wounds.  Johnson did not believe this was true based on her conversations with Dr. Potek as well as her review of Owens's treatment records obtained from Drs. Potek and Nepsund.  Johnson assessed Owens again on May 14, 2007; Owens reported that he was practicing good hygiene and consistent wound care to avoid infection and promote healing.  The next day, Dr. Hall examined Owens and recommended that he receive a surgical consultation with Dr. Raiker for a second opinion about further treatment of Owens's pressure ulcers.

Johnson arranged for Owens to be seen by Dr. Raiker on May 22, 2007.  After examining Ownes, Dr. Raiker recommended a trial period during which Owens would use a wound vacuum to treat his sacral pressure ulcer.  Dr. Raiker did not recommend surgery.

Upon reading Dr. Raiker's recommendation, Johnson contacted Dr. Hall to express concern over the feasibility of using a wound vacuum in the jail.  Specifically, she opined that the safety and security issues raised by putting medical equipment in a jail cell, ensuring proper care for the equipment and periodically transporting Owens to the clinic for wound dressing made this plan impractical.  Johnson believed that there might be more feasible options for treating Owens's pressure ulcers in jail and she asked Dr. Hall whether there were appropriate alternatives.

Dr. Hall recognized the safety and security concerns raised by the use of a wound vacuum in a jail. He explained that in his medical opinion, although continued use of wet-to-dry dressing changes would result in a slower healing process than use of the wound vacuum, the wound vacuum was not required for healing, which would be the end result regardless of the method.

As a result of this conversation with Dr. Hall, Johnson decided that Owens should continue to care for his wound by using wet-to-dry dressings two times per day. Initially, his wounds showed good evidence of healing, such as a decrease in both size and depth of the wounds as well as the presence of a large amount of granulation tissue in the wounds.

A couple weeks later, however, on June 28, 2007, Owens had a fever of 102.7 and body aches. He was taken to the St. Croix Regional Medical Center Emergency Room for medical evaluation. At the ER, Owens was examined by a physician who sent Owens back to the jail with the instruction to take Tylenol as needed.

The next morning, defendant Johnson met with Owens and, because of his lack of improvement, arranged for him to go back to the St. Criox ER for reevaluation. At the ER, Owens was seen by Dr. Ajaelo, who gave him a new prescription for Ciprofloxacin and sent him back to the jail.

On July 2, 2007, Owens told a jailer that he was burning up and that his body ached all over. Jail staff called Johnson at home to report Owens's condition; she instructed the staff to give him a dose of Tylenol, wait one hour and if there was no improvement in his condition, then staff should contact the St. Croix ER. The staff did as Johnson instructed and upon speaking with a nurse at the ER, staff decided that Owens should be taken to the ER.

Upon arriving at the ER, Owens was evaluated and subsequently admitted to Regions Hospital. Owens had developed an infection in his pressure sores that required that he receive antibiotics via an IV and surgical debridement of his wounds. Although Regions Hospital was prepared to discharge Owens on July 6, 2007, the jail could not house him because the physician had prescribed intravenous antibiotics, which could not be safely administered in the jail setting. Owens remained at the hospital for an additional three weeks so that he could continue receiving intravenous antibiotics. Upon Owens's release, the physician who was attending to Owens required that a wound vacuum be used to care for his wounds. Because use of a wound vacuum in the jail still implicated safety and security concerns, the jail decided to return Owens to his home with the wound vacuum and a prescription for oral antibiotics.

Owens lived at his home with his mother for one week before the district attorney ordered that Owens be returned to the jail. Owens's treating physician agreed with this decision because Owens was not appropriately caring for himself at his home.

Owens returned to the Polk County jail on August 2, 2007. Upon his return, defendant Johnson made arrangements for Owens to: (1) use his wound vacuum, (2) be transported to the St. Croix Clinic three times a week for dressing changes and adjustments to the vacuum and (3) receive hygiene care in the jail from Polk County home health.

On December 12, 2007, Owens was transferred from the Polk County jail to the Dodge Correctional Institution.

ANALYSIS

**I. Summary Judgment Standard**

Under Fed. R. Civ. P. 56, summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. In ruling on a motion for summary judgment, the admissible evidence presented by the nonmoving party must be believed and all reasonable inferences must be drawn in the nonmovant's favor. However, a party that bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires a trial. *Hunter v. Amin*, 538 F.3d 486, 489 (7th Cir. 2009) (internal quotation omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).

The applicable substantive law dictates which facts are material. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). Further, a factual dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248; *Roger Whitmore's Auto. Servs., Inc. v. Lake County, Ill.*, 424 F.3d 659, 667 (7th Cir. 2005). The court's function in a summary judgment motion is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249; *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007).

**II. Owens's Eighth Amendment Claim**

Owens claims that Johnson was deliberately indifferent to his serious medical needs, which is the two-part test used to describe a violation of a prisoner's constitutional right to medical care. *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). A "serious medical need" may be

a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 584-85 (7th Cir.2006). The condition does not have to be life threatening. *Id.* A medical need may be serious if it "significantly affects an individual's daily activities," *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir.1998), if it causes pain, *Cooper v. Casey*, 97 F.3d 914, 916-17 (7th Cir.1996), or if it otherwise subjects the prisoner to a substantial risk of serious harm, *Farmer v. Brennan*, 511 U.S. 825 (1994). It is undisputed that Owens suffered from pressure sores on his buttocks and that these sores were a serious medical need.

But there is no evidence whatsoever that Johnson–or anyone else for that matter–was deliberately indifferent to this serious medical need. "Deliberate indifference" means that government actors were aware that a prisoner required treatment for a serious medical need but disregarded the known risk by failing to take reasonable measures to abate the condition. *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997). A prisoner's insistence on a specific course of treatment does not implicate the Eight Amendment, and a state actor's failure to provide that specific course of treatment is not deliberate indifference: "the Constitution is not a medical code that mandates specific medical treatment." *Id.,* citation omitted.

Owens does not dispute that he received treatment from defendant Johnson, a certified correctional health professional. Instead, he contends that the treatment he received was constitutionally inadequate because he was entitled to have prompt surgery on his pressure sores. The undisputed facts, however, establish *at most* a difference of opinion regarding the most appropriate treatment of Owens's pressure sores. Such differences of opinion do not rise to the level of deliberate indifference. *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261-62 (7th Cir.

1996); *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996) (decision whether one treatment is preferable to another is beyond Eighth Amendment's purview). When a prisoner disagrees with a medical professional's prescribed treatment, there is no constitutional claim "unless the medical treatment is so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition." *Id.* at 592 .

Indeed, inadvertent error, negligence, malpractice, even gross negligence in providing treatment all are insufficient to establish deliberate indifference. *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007); *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006) ("[E]ven admitted medical malpractice does not give rise to a constitutional violation."). In other words, neither an incorrect diagnosis nor improper treatment resulting from negligence establish an Eighth Amendment claim. *Gutierrez v. Peters*, 111 F.3d 1364, 1374 (7th Cir. 1997). A jury may infer deliberate indifference from a medical professional's treatment decision only if that decision was so far afield of accepted professional standards as to imply that it was not actually based on a medical judgment. *Estate of Cole,* 94 F.3d at 262.

Before Owens was incarcerated, one doctor recommended that he see a surgeon to discuss further treatment for his pressure sores, including further debridement of his wounds. Although Owens missed this appointment due to his incarceration, there is no evidence from which a reasonable jury could find that keeping this appointment would have resulted in the surgeon finding that the only treatment for Owens's wounds was debridement or some other surgical treatment. In other words, there is no evidence to support Owens's personal opinion that surgery was the only reasonable treatment.

To the contrary, the undisputed evidence unequivocally establishes that defendant Johnson's decision to pursue alternative treatment of Owens's sores was based on sound medical judgment. First, Johnson met with Owens to discuss treatment options and to ensure that he was receiving the dressing supplies he need to care for his wounds. Then Johnson called Owens's previous medical providers. She learned that while Owens may have been scheduled to *consult* with a surgeon, he was *not* scheduled for any surgery and no doctor had decided whether he actually needed surgery. Johnson then scheduled Owens to see the institutional doctor, Dr. Hall. Dr. Hall supported Johnson's wound hygiene program for Owens and added a prescription for antibiotics to treat any bacterial infections. Next, a second nurse called one of doctors who had treated Owens's pressure sores outside the jail, Dr. Potek, who confirmed both that the treatment Owens was receiving was appropriate and that Owens had not been scheduled for surgery. Thus, the treatment defendant Johnson was administering was supported by no less than two doctors and a second nurse.

So how does Owens respond to the fact that defendant Johnson's actions were supported by two doctors? He posits that this court should disregard those opinions because these doctors conspired with Johnson to provide Owens with inadequate medical care in violation of the Eighth Amendment.[2] Owens has provided no evidence to support this far-fetched, borderline paranoid argument, nor could he: the undisputed evidence is that Dr. Hall's or Dr. Potek's recommendations and orders regarding Owens's treatment were based on their sound medical judgment.

---

[2] As already noted, Owens has asserted a constitutional conspiracy claim against all three defendants. That claim will be addressed tersely in the next section.

11

The doctors did not merely rubber stamp Johnson's decision to provide Owens with less invasive treatment than surgery. Instead, both doctors recommended–and Dr. Hall engaged in– continued monitoring of Owens's wounds to make sure that the recommended treatment was working. With knowledge that Owens's wounds were being regularly assessed, the doctors prescribed and approved treatment involving oral antibiotics in conjunction with a specific hygiene program that included regularly changing the wet-to-dry dressings on Owens's wounds. This establishes that the doctors were exercising medical judgment. There is no evidence that the doctors' input was so far afield of accepted professional standards or so blatantly inappropriate as to demonstrate deliberate indifference.

Moreover, Owens's wounds seemed to be improving, though slowly, under this treatment regimen. Johnson knew this because she never stopped monitoring Owens's wounds. Indeed, in response to Owens's persistent demands, Johnson even arranged for a surgical consultation with Dr. Raiker. This surgeon did not recommend, let alone require, that Owens undergo surgery on his wounds. Instead, Dr. Raiker recommended (but did not require) the trial use of a wound vacuum. Believing that such a device presented security and safety concerns as well several practical issues, Johnson contacted Dr. Hall to ask his opinion on the need for a vacuum.

Finally, when Owens fell ill with fever and body aches, Johnson immediately sent him to the ER, where a doctor assessed him and returned him to the jail without discovering that his wounds were infected. Because Owens's symptoms did not improve, Johnson sent Owens back to the ER for a second, and then a third examination until a doctor discovered that Owens's wounds were infected. Johnson's decision to keep sending Owens back to the ER based on his symptoms establishes that she had no intention of mistreating Owens.

Although Owens fervently believes that he could have–*should* have–received different treatment, the Constitution does not require prison officials to provide a prisoner with the medical care a prisoner subjectively believes appropriate; it requires officials to rely on their medical judgment to provide prisoners with care that is reasonable in light of their knowledge of each prisoner's problems. *E.g. Estelle*, 429 U.S. at 107 (plaintiff's objection to prison physician's failure to order back X-ray failed to state claim under Eighth Amendment when prison officials provided minimal treatment). Regardless which treatment Owens personally preferred, the most that a reasonable jury could find from the undisputed evidence would be minor differences in medical opinion regarding the appropriate treatment for Owens's sores. This cannot prove a constitutional violation. Therefore, Johnson is entitled to summary judgment on Owens's substantive Eighth Amendment claim.

### III. Owens's Conspiracy Claim

Owens asserts in his amended complaint that defendants Johnson, Hall and Potek conspired to violate his rights under the Eighth Amendment by intentionally agreeing that Johnson would provide him with inadequate medical care for his pressure sores. As was explained when screening Owens's complaints, his conspiracy claim hinges on his Eighth Amendment claim. Dkt. 5 at 10; dkt. 31 at 4. "For liability under § 1983 to attach to a conspiracy claim, defendants must conspire to deny plaintiffs their constitutional rights: there is no constitutional violation in conspiring to cover up an action which does not itself violate the Constitution." *Hill v. Shobe*, 93 F.3d 418, 422 (7th Cir. 1996). Because Owens's substantive Eighth Amendment claim has failed, his conspiracy claim fails with it. *See, e.g., Cefalu v. Village*

13

*of Elk Grove*, 211 F.3d 416, 423 (7th Cir. 2000) (failure to prove constitutional injury forecloses relief on conspiracy claim).

## ORDER

IT IS ORDERED that:

(1) Defendant Donna Johnson's motion for summary judgment, dkt. 35, is GRANTED.

(2) Because plaintiff Daniel Owens's Eighth Amendment claim against defendant Donna Johnson fails, his conspiracy claim against all three defendants must be dismissed.

(3) The clerk is directed to enter judgment in favor of defendants Donna Johnson, Jeff Hall and Arnold Potek and to close this case.

Entered this 8th day of September, 2010.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge